Burke Wonnell
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: burke.wonnell@fd.org

Counsel for Defendant James Edward Barber

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>  vs.<br><br>JAMES EDWARD BARBER,<br><br>             Defendant. | Case No. 3:19-cr-93 RRB MMS<br><br>**MOTION TO DISMISS INDICTMENT DUE TO PROSECUTORIAL MISCONDUCT** |
|---|---|

    A period of excludable delay under 18 U.S.C. § 3161(h) may occur as a result of the filing of this motion. The Speedy Trial Act calculation, as of the date of the filing of this motion, shows that the 70-day mark would have previously fallen on March 21, 2020, but is presently tolled by various court orders due to the coronavirus pandemic. Should this motion resolve prior to the expiration of COVID-19 tolling, it should not provide a basis for further tolling.

    COMES NOW Defendant James Barber, by and through undersigned counsel, and hereby moves the Court to dismiss the indictment in this case. The First Superseding Indictment at Docket 109 was obtained through the use of false and misleading testimony on a subject material to the grand jury's deliberations.

/

/

## I. PROCEDURAL POSTURE AND FACTUAL ALLEGATIONS

All factual allegations contained in this motion, not otherwise supported by the record, are based upon the reports and other discovery produced by the government to date. Defendant accepts these allegations for the purpose of arguing this motion only. Defendant reserves the right to challenge any and all of these allegations at trial.

The allegations forming the basis of the surviving charge against Mr. Barber have been well covered in the record below. To recap, on or about July 21, 2019, Defendant Barber was stopped for speeding on the Kenai Peninsula. Pursuant to an unreasonable search of Mr. Barber's vehicle, Forest Service Officer Dale Linton discovered a bolt action .22 carbine in the backseat. That same day, Mr. Barber was charged in state court with two misdemeanor offenses and was released on bail. On or about July 27, 2019, Mr. Barber was arrested by Officer Linton on federal charges of felon in possession of firearm.

On or about August 8, 2020, pursuant to a probation inspection of Barber's residence related to an application for release in the instant case, three boxes of .22 ammunition were found on a shelf. Barber remained in detention from his arrest on July 27, 2019, until his release on conditions to a structured living facility on January 21, 2020. He did not return to his residence.

Barber was initially indicted on felon in possession of a firearm, and felon in possession of ammunition. Docket 17. Subsequently, evidence of the firearm discovered during the July 21st stop was suppressed because of Officer Linton's Fourth Amendment violation. Docket 69. Trial was scheduled to commence on January 27, 2020, but was continued due to a medical emergency involving the undersigned's family. Docket 101. Via order entered on January 30, 2020, trial was rescheduled for March 18, 2020. Docket 105.

Following these hearings, Officer Linton showed up unannounced at the living facility where Mr. Barber was living in order to conduct a curfew check, although he had no responsibility for supervising Mr. Barber. On February 1st and 4th of 2020, Officer Linton went to the apartment complex where Mr. Barber had been living and questioned Daudi Foster, a neighbor. Linton memorialized these interviews in a report, which stated the following:

> On 02/01/2020, at approximately 1200 hours, I made contact with a Daudi Foster at his residence, located at [redacted] in Anchorage. I was advised by another unidentified male that resided in the complex that Foster was the complex manager, or acted as such, and was residing in apartment number two. Foster confirmed that he acted as the complex manager of sorts, and assisted in those duties in the absence of the actual complex owner, later identified verbally by Foster as Lyle Newby.

Upon contact with Foster he voluntarily agred to speak with me, which was recorded on Axon body camera. I asked Foster if he had prior interactions with former complex resident James Edward Barber. Foster reported that he had some prior interactions with Barber. Foster described recalling a specific prior conversation he had with Barber, and that Barber made statements referencing firearms, or talked about having them, and describing his interests in guns. Foster stated that he did not see Barber with a gun, or ammunition, and that he had not been in Barber's residence.

On 02/04/2019, at approximately 1145 hours, I contacted Daudi Foster to conduct a follow up interview at his residence. Foster again spoke with me voluntarily which was recorded on Axon body camera. I asked Foster if Barber was the only resident living in the apartment he rented at the complex. Foster stated he observed an unidetified [sic] female with Barber in and out of the residence at times, and therefore assumed that she was living there. He further reported that the same female was at the residence for a couple days without Barber, and during a time when a front window of the apartment had fallen out. Later the unidentified female had gained access to the residence through the window.

Foster stated that he was told by Barber himself that the front window to his apartment had fallen out. Foster also reported that the apartment was not burglarized, or broken into. He reported that after a couple days around that time period the unidentified female left, and Barber then had returned alone, and resided in his apartment alone, until not returning again a short time period later. Foster stated that it was known to him that Barber was the primary tenant of the apartment, and the sole party that paid rent when it was collected either by himself, or the complex owner Lyle Newby.

Exhibit "A", attached.

These contacts were indeed recorded surreptitiously by Linton. But the audio and video recording from the February 4th interview present a very different picture of Mr. Foster's statements:

*United States v. James Edward Barber*
Case No. 3:19-cr-00093-RRB-MMS Page 4

LINTON: The other day I was asking you about Mr. Barber, and, when you . . . he had resided here, was he the only one who lived in that residence?

FOSTER: There was a girl that was there, but I never spoke to her. I don't know her, I don't know her name or anything.

LINTON: Okay. Did she live there?

FOSTER: Yeah.

LINTON: Okay, how did you know she lived there?

FOSTER: Because I seen her when he first moved in she was there for a couple days, and then they were you know in and out, in and out, and they were together riding in the car together, so I assumed they lived there. And then when . . . he disappeared for a while before he got in trouble. And then she would come back, and then she would come back and she was living there for a quick day or two, before when she, when they broke in the window, when she got in through the window, and so that's how . . .

LINTON: She got in through the window.

FOSTER: Well yeah, and then he was gone already. And then, after that, he did come back, but then she wasn't there anymore after that, so that's the only . . .

LINTON: Is he was there, living there by himself the whole time?

FOSTER: Yeah, for the most part. Yeah. Stop it [directed at pet]!

LINTON: Oh, the window got, you said a window got broke by . . .

FOSTER: That, the first, the window that's boarded up now?

LINTON: Yeah.

FOSTER: He said it fell out, I never seen it broken, but I think she had, the big one that's there . . .

*United States v. James Edward Barber*
Case No. 3:19-cr-00093-RRB-MMS                                                                    Page 5

LINTON:  He never said it was broken into . . .

FOSTER:  No, he just said it was, it fell out . . .

LINTON:  Yeah . . .

FOSTER:  Yeah, it wasn't broken into . . .

LINTON:  It wasn't burglarized or anything?

FOSTER:  No, no, and then, and how she got in one time, she took the big, she took the big, damnit, sit down [at pet], sit!  Nobody trying to talk to you!  She took the big one out, and got in that way, I believe she did, and I think maybe, maybe that one was broken, but I don't remember . . .

LINTON:  But he never came to you and said it was, the place was burglarized or broken into. . .

FOSTER:  No, no, the only thing we talked about was somebody taking his dog . . .

LINTON:  Oh, okay.

FOSTER:   And then, and he let [unintelligible] go in the apartment and get it and he let it out and he wasn't, I guess he wasn't watching and then they took off with the dog.

LINTON:  Okay.

FOSTER:  And that's about it.

LINTON:  Okay, gotcha.

Recording of 2/4/20 interview, at 00:54-2:36

Nowhere in the course of either interview did Foster indicate that he had spoken with Mr. Barber during the time period charged in the indictment, or that Mr. Barber had ever denied that his residence had been burglarized during that time period.

Subsequent to these interviews, on February 19, 2020, the government returned to Grand Jury to seek a superseding indictment expanding the time frame for Count Two. Linton testified in response to questions from Assistant United States Attorney Jonas Walker. After presenting evidence related to Count Two, the Grand Jury had questions about the government's theory. Specifically, at least one juror had questions about the timeline, about the identity of the other individual who was in and out of the residence, and how the government could show that Barber possessed the ammunition. <u>See</u> Exhibit B [sealed], at 33. After more questions related to the timing of Barber's arrest and detention, relative to the discovery of the ammunition, the following exchange occurred:

> JUROR: But the home was broken into before the observations were made according to this home transcript.
>
> MR. WALKER: Well, I guess that's sort of . . . . .
>
> JUROR: Just in terms of the integrity of what was in the home.
>
> Q [JONAS WALKER]: Officer Linton, I guess, let me -- let me turn that to you.
>
> A [OFFICER LINTON]: Okay.
>
> Q  As far as you know **has that residence been burgled during the period of July 21 to August 9, 2019?**
>
> A  To my knowledge it -- I haven't had any proof of that in my investigations and **I did have an interview with Dowdy [sic]**

> **Foster stating that it was not burglarized and he's the manager of that complex.**
>
> Q Okay. And did -- according to Dowdy [sic] Foster, did the defendant say anything to Daudi Foster about whether or not there had been a burglary at that residence?
>
> A So James Edward Barber, in conversations with Dowdy [sic] Foster, as noted in my supplemental incident report, **Barber told Foster** -- excuse me, Daudi Foster **that it was not burglarized**, there was never a report of burglary. As a matter of fact, Daudi Foster stated it was not, and that's based -- that's in the report.

Exhibit B [sealed], at 43-45. [Emphasis added].

This testimony was not corrected.

## II.  PROSECUTORIAL MISCONDUCT

It has long been established that a conviction obtained through use of false evidence, known to be such by representatives of the Government, violates due process. <u>Napue v. People of State of Ill.</u>, 360 U.S. 264, 269 (1959) (citations omitted). The same is true when the Government knowingly allows false evidence to go uncorrected when it appears. <u>Id.</u> The principle that the Government may not knowingly use false evidence, including false testimony to obtain a tainted conviction, is "implicit in any concept of ordered liberty." <u>Id.</u>

This rule applies with equal force in grand jury proceedings. The government has an affirmative obligation under the Fifth Amendment to correct false or perjured testimony before the Grand Jury:

> We hold that the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel — and, if the perjury may be material, also the grand jury — in order that appropriate action may be taken."

U.S. v. Basurto, 497 F.2d 781, 785-786 (9th Cir. 1974).

The Basurto Court highlighted the lack of oversight of the Grand Jury process, and relied "on a long line of cases which recognize the existence of a duty of good faith on the part of the prosecutor with respect to the court, the grand jury, and the defendant." Id., at 786.

The blatant misrepresentation by the prosecution and the investigating officer is especially flagrant given that the investigating officer has already been singled out for violating the Constitution in the very same case. The remedy, when the violation is discovered prior to the attachment of jeopardy, is that the indictment must be cured. See Id.

### III. ARGUMENT

This case presents a unique opportunity to audit the government's handling of its responsibilities to the Court, the Grand Jury, and the Defendant. The government has failed massively in its responsibility to employ fundamental fairness with respect

to Mr. Barber when nobody is looking. The government's case is weak, undersigned counsel highlighted this weakness on the record, and the Grand Jury, presumably composed of lay people, saw it all on its own. The problem with the government's theory is the absence of any evidence concerning when the ammunition was placed where it was found, who placed it there, and the time period in which Mr. Barber was locked up.

But rather than acknowledge the shortcomings of its case, the Government sought to cure these defects by putting a federal agent on the stand to falsely suggest that for the relevant time period -- July 21 to August 9, 2019 -- the manager of the property, Daudi Foster, had affirmatively denied that the residence in question had been broken into and burglarized. The agent also falsely testified that Mr. Barber had himself told Foster that it was not burglarized during that time period. None of these purported statements were true. Mr. Foster was describing events that took place **before** Mr. Barber had been detained and charged in connection with the present offense.

This testimony was not merely an exaggeration; it was false and misleading on a material issue that the Grand Jury was directly questioning. To permit a trial on this indictment would be to effectively subvert the limited role of the Grand Jury in the process and to render those proceedings meaningless. The only

remedy is to dismiss this indictment, without prejudice to the government's ability to re-present without the use of false and misleading testimony.

## IV. CONCLUSION

For the aforementioned reasons, the indictment in this case should be DISMISSED.

DATED at Anchorage, Alaska this 13th day of April, 2020.

Respectfully submitted,
FEDERAL PUBLIC DEFENDER
DISTRICT OF ALASKA

*/s/ Burke Wonnell*
Burke Wonnell
Assistant Federal Defender

Certificate of Service:
I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system on April 13, 2020. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.
*/s/ Burke Wonnell*